IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


| | | |
|---|---|---|
| The CINCINNATI INSURANCE COMPANY, | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 15 C 686 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| BERKSHIRE REFRIGERATED | ) | |
| WAREHOUSING, LLC, & CHARTER OAK | ) | |
| FIRE INSURANCE COMPANY a/s/o GOLD | ) | |
| STANDARD BAKING, INC. | ) | |
| | ) | |
| *Defendants*. | ) | |


## MEMORANDUM OPINION AND ORDER

Plaintiff Cincinnati Insurance Company filed a Complaint for Declaratory Relief against Berkshire Refrigerated Warehousing, LLC pursuant to 28 U.S.C. §§ 2201 and 1332 to determine whether Cincinnati has an obligation to defend or indemnify Berkshire in an underlying action brought against it by Charter Oak Fire Insurance Company as subrogee of Gold Standard Baking, Inc. Charter Oak intervened as a defendant. Cincinnati filed an Amended Complaint, and the parties filed cross-motions for summary judgment. For the following reasons, the Court grants Cincinnati Insurance Company's Motion for Summary Judgment [94] and denies Berkshire Refrigerated Warehousing, LLC's Motion for Summary Judgment [97].

## BACKGROUND

The parties do not dispute the following facts unless otherwise noted.

Defendant Berkshire Refrigerated Warehousing, LLC ("Berkshire") is a warehousing, logistics, and refrigerated storage business. (Dkt. 99-14, Grzywacz Dep., 9:18-20; Dkt. 101, ¶ 24.) About ninety percent of Berkshire's storage business consists of storing frozen food

1

products.  Berkshire also stores its customers' non-refrigerated and non-frozen products.[1]  (Dkt. 99-14, 9:21-10:1, 10:19-21, 11:1-8.)

## I.    The Storage and Loss of Gold's Baking Equipment

Berkshire has worked with its customer Gold Standard Baking, Inc. ("Gold") since 2005, typically storing and shipping Gold's frozen croissants and sometimes refrigerating their flour. (*Id.*, 12:23-13:17, 13:24-14:3.)  Gold gives Berkshire about $4 to 5 million worth of business each year, making them Berkshire's second largest customer.[2]  (*Id.*, 14:4-13.)

In late summer of 2010, Eberhard Oberlander of Gold, called Ted Gryzwacz, President and CEO of Berkshire.  Oberlander told Gryzwacz that he had some baking equipment that he needed to put onto trailers because he was preparing for an outside audit, and he wanted to rent the trailers from Berkshire.  (*Id.*, 14:16-15:4; 28:13-22.)  Gryzwacz told Oberlander that he did not have available any such trailers, known as "dry trailers" because they do not have refrigeration capacity.  However, Gryzwacz said that he could rent dry trailers and send them to Gold's facilities, and he quoted Oberlander a price and Oberlander agreed.  (*Id.*, 16:2-15, 17:12:20.)  It was not the first time that Berkshire had rented dry trailers for a customer to move product that did not need to be frozen or refrigerated.  (*Id.*, 17:18-18:5.)  Berkshire began renting the trailers to Gold on November 28, 2010. (Dkt. 99-12, at 2.)

In early 2011, Oberlander again called Gryzwacz, this time to ask whether Berkshire had a place to put the trailers.  Gryzwacz said he could move them to Berkshire's Packers Avenue facilities. (Dkt. 99-14, 19:11-20.)  Gold filled the trailers in late spring 2011, and Berkshire picked up the trailers and moved them to its facilities at 4550 S. Packers Avenue in Chicago.

---

[1]  Berkshire President and CEO Ted Gryzwacz testified that "[t]he only products that we store that are nonrefrigerated or frozen are products that will eventually be used in the packaging of food materials." (Dkt. 99-14, 11:1-8.)  He also later testified that Berkshire sometimes rents "dry trailers" when customers request to move dry product.  (*Id.*, 19:21-20:5.)
[2]  This is at least true at last count as of Gryzwacz's testimony. (*Id.*, 14:12-13.)

(Dkt. 103, ¶ 10.)  Berkshire did not charge Gold for moving and storing the trailers.  Gryzwacz considered this an "accommodation" for Gold.  (Dkt. 99-14, 19:24-20:3.)

Berkshire stored the trailers in the vacant lot at 4550 S. Packers Avenue.  The land itself is not fenced in, but the lot sits in an industrial park which has a fence.  (*Id.*, 20:11-23.)  The lot did not have a security gate or security guards but it had cameras that surveilled the site where Berkshire stored the trailers.  (*Id.*, 21:3-16.)  The trailers had locks and Berkshire did not have any key or combination to open the locks.  (*Id.*, 21:21-22:10.)

In May or June of 2011, Gryzwacz called Oberlander to tell him that Berkshire had started a construction project on the Packers Avenue facility and that Berkshire would need the space where Cincinnati's trailers stood but could store them at a space down the street that Berkshire had rented from the company Fresh Start.  Oberlander agreed that Berkshire could move the trailers to this new location.  (*Id.*, 22:10-23:18.)  Berkshire moved the four trailers holding Gold's baking equipment, along with about 10 to 12 other Berkshire trailers, to the new location at 1250 W. 42nd Street in Chicago.  (Dkt. 103, ¶ 11; Dkt. 99-14, 25:13-18.)  The 42nd Street space also had cameras surveilling the lot and a gate that was locked at night.  (Dkt. 99-14, 25:19-26:4.)  Fresh Start employees granted access to the lot through the gate between 4 or 5 AM and 10 PM.  (Dkt. 103, ¶ 13.)  A driver conducted inventory of the Berkshire and Fresh Start lots each morning. (Dkt. 99-14, 29:6-9.)

In August of 2011, when Oberlander next needed to access the baking equipment stored in the trailers, he called Gryzwacz so that he and another individual affiliated with Gold, Noel Rodriguez, could go over to Fresh Start to take a look in the trailers.  Gryzwacz and his son accompanied Oberlander and Rodriguez over to Fresh Start, and when they got there, Oberlander

and Rodriguez opened up the trailers, crawled inside, looked around, and closed them up when finished. (*Id.*, at 27:6-28:5.)

Berkshire next contacted Gold on January 18, 2012. (*Id.*, 29:1-5; Dkt. 103, ¶ 16.) That morning, Berkshire's driver noticed that four trailers and their contents had gone missing from the 42nd Street facility. Indeed, they were the same four trailers that Berkshire was storing for Gold.[3] (Dkt. 103, ¶ 16.) Berkshire notified Gold and the Chicago Police Department. The trailers would have needed a tractor to pull them away. When Gryzwacz viewed the security camera tapes, he found that the tape was blank for about six hours during the time when the trailers disappeared. To this day, the trailers have not been located. (Dkt. 99-14, 29:10-32:15.)

## II.    Berkshire's Insurance Policy from Cincinnati

Berkshire purchased Insurance Policy No. COP 233 01 82/COA 233 01 82 (the "Policy") from the Cincinnati Insurance Company ("Cincinnati") for a period covering December 15, 2011 to December 15, 2012. (Dkt. 13, ¶ 23; Dkt. 96-9.) The Policy included in pertinent part provisions on Property Coverage, Commercial General Liability ("CGL") Coverage, and Commercial Umbrella Liability Coverage. (Dkt. 96-9 at 35, 107, 250.)

Under the Property Coverage provision, Cincinnati insured Berkshire for property "at all covered locations" and replacement costs for business personal property. (*Id.* at 35.) "Covered locations" include "any location or premises where [the insured] has buildings, structures, or business personal property to which this Coverage Part applies," but caveats that if the Coverage Part includes a Scheduled Locations Endorsement, then a "covered location" means a "location that is described on that endorsement." (*Id.* at 40.) Berkshire's Policy indeed included a Scheduled Locations Endorsement listing two locations: 4550 S Packers, Chicago, IL, 60609 and 1211 S Prairie Ave, Unit 3402, Chicago, IL, 60605. (*Id.* at 8.) "Covered location" generally

---

[3] Berkshire had also been storing an additional 10-12 trailers that same night. (Dkt. 103, ¶ 16.)

does not include vehicles containing covered property, unless those vehicles are "on or within 1,000 feet of the premises of any covered building or structure." (*Id.* at 40.) Regarding business personal property, the Policy defines "business" as "normal business activities occurring at covered locations," which includes the personal property of others that is in the insured's "care, custody, or control, or for which you are legally liable," even in a vehicle, as long as it is also "on or within 1,000 feet" of what the Policy deems "covered locations." (*Id.* at 40, 43.)

Further, in its CGL Coverage, Cincinnati agrees to pay sums that Berkshire "becomes legally obligated to pay as damages," including for property damage. (*Id.* at 108.) The Policy states that Cincinnati has the duty to defend the insured against any such suit, but also that Cincinnati has no duty to defend for suits seeking damages for "… 'property damage' to which this insurance does not apply." (*Id.*) The Policy goes on to exclude coverage for "[p]ersonal property in the care, custody of control of an insured." (*Id.* at 112.)

Finally, in its Umbrella Liability Coverage, Cincinnati agrees to pay on behalf of Berkshire the "ultimate net loss" that Berkshire is legally obligated to pay, including for property damage, when damages go beyond the coverage of other underlying insurance. (*Id.* at 250, 254.) However, an endorsement added to the Policy alters the definition of "personal property" included in the Umbrella Liability Coverage to exclude damage to personal property "not owned by an insured and in the care, custody or control of an insured…" (*Id.* at 283.)

## III.   Procedural History & Allegations in the Underlying Complaint

On July 9, 2014, Gold's insurance company Charter Oak Fire ("Charter Oak") filed suit, as subrogee of Gold, against Berkshire. (Dkt. 99-4, at 2.) In this original underlying complaint, Charter Oak alleged that Berkshire engaged "in the business of warehousing and refrigerated storage" and, sometime prior to the date of the loss, Gold had entered into an agreement with

Berkshire "for the storage of equipment owned by GOLD in trailers provided by BERKSHIRE at a location provided by BERKSHIRE in exchange for a monthly fee." (*Id.* ¶¶ 12, 14.) The complaint goes on to allege that Berkshire initially stored these trailers at their Packers Avenue premises but "without the knowledge and consent of GOLD; [sic] the trailers were moved by BERKSHIRE and relocated to 1250 W. 42nd Street, Chicago, Illinois." (*Id.* ¶ 15.) The complaint then alleges that on January 18, 2012 the trailers and their contents were missing from the Packers Avenue premises and had been either released to an unauthorized party or otherwise stolen from the 42nd Street premises. (*Id.* ¶¶ 16, 21.) The complaint sought $250,000 relief to cover damages to cover the loss of the contents pursuant to claims for bailment/negligence (Count I) and negligence (Count II). (*Id.* ¶¶ 17-23.)

Several months later on December 3, 2014, Cincinnati counsel Nicholas Butovich sent a letter to Erin Grzywacz at Berkshire stating that it had reviewed Charter Oak's complaint, the materials provided by Berkshire, the Policy and other related documents, including a survey of the properties at issue. Based on these materials, the letter concluded that the Policy did not provide Berkshire any coverage for the Charter Oak suit and therefore Cincinnati did not have the duty to defend or indemnify Berkshire for the matter. (Dkt. 99-6, at 2.) Specifically, the letter first points to Charter Oak's allegation and Cincinnati's investigation revealing that Berkshire agreed to store the equipment owned by Gold and thus fell under the "care, custody or control" exclusion from the Policy's CGL and Umbrella Coverage. (*Id.* at 4-5.) The letter points out that this equipment and its storage trailers had been stolen from their location at 1250 W. 42nd Street. As part of its investigation, Cincinnati had a surveyor measure the distance between Berkshire's Packers Avenue premises – the one which had been endorsed as one of Berkshire's insured locations in the Policy – and the 42nd Street premises to which Berkshire had relocated

Gold's equipment. The surveyor certified the shortest distance as 1,774.06 feet. (*Id.*; Dkt. 96-5; Dkt. 96-6.) Accordingly, the letter stated, the property also did not qualify as "business personal property" because it was not at or within 1,000 feet of the covered address, 4550 S. Packers Avenue, and therefore did not fall under the Policy's Property Coverage Part. (Dkt. 99-6, at 6.) Given this, Cincinnati concluded the Policy did not provide coverage for either Charter Oak's suit against Berkshire or the loss of Gold's equipment. Cincinnati reserved the right to amend its position as new information became available. (*Id.* at 7.) Berkshire's insurance broker Marvin Rotstein responded on December 12, 2014, arguing that Cincinnati had wrongfully denied coverage because Berkshire had only charged Gold a fee for the trailer rental, not for any storage; that Gold had access and inspected the trailers; and that Berkshire therefore had no obligation to safeguard the trailers. (Dkt. 99-12, at 2-3.) He did not dispute the distance between the Packers Avenue and 42nd Street premises, and in fact stated that the trailers were moved to and reported missing from the Fresh Start lot at 42nd Street. (*Id.* at 3.)

Following this initial back-and-forth, on January 23, 2015 Cincinnati filed a Complaint for Declaratory Relief asking this Court to find and declare that Cincinnati does not have an obligation to defend or indemnify Berkshire in this matter, for the reasons outlined in its counsel's December 3 letter to Berkshire. (*See* Dkt. 1.)

After this, Charter Oak filed its first amended complaint against Berkshire in the underlying matter on May 26, 2015. (Dkt. 99-5.) Their amended complaint revised Paragraph 15, from:

> Initially, BERKSHIRE placed the trailers they provided to GOLD on their premises at 4550 S. Packers Avenue, Chicago, Illinois but sometime prior to January 18, 2012, without the knowledge and consent of GOLD; the trailers were moved by BERKSHIRE and relocated to 1250 W. 42nd Street, Chicago, Illinois.

To:

> Sometime prior to January 18, 2012, BERKSHIRE took possession of the goods of GOLD which were placed into trailers provided by BERKSHIRE and moved to their premises at 4550 S. Packers Avenue, Chicago, Illinois.

(*See* Dkt. 99-4, ¶ 15; Dkt. 99-5, ¶ 15.)  In fact, Charter Oak removed any mention of the 42nd Street location from its amended complaint.  (*See* Dkt. 99-4.)  Moreover, Charter Oak's amended complaint generalized its statement that the trailers and Gold's equipment were found to be missing from the Packers Avenue facility to stating more broadly that the trailers and their contents "were found to be missing from the possession of BERKSHIRE."  (*See* Dkt. 99-4, ¶ 16; Dkt. 99-5, ¶ 16.)  Meanwhile, in the instant case, Cincinnati filed its First Amended Complaint against Berkshire on June 12, 2015, adding the underlying amended complaint as an exhibit and updating its pleadings accordingly.[4]  (*See* Dkt. 21.)

On January 22, 2016, Berkshire's counsel notified Cincinnati's counsel that Charter Oak had proposed that Berkshire and Charter Oak agree to a consent judgment in the underlying suit in the amount of $259,956.54 in exchange for Berkshire assigning all of its claims against Cincinnati to Charter Oak.  (Dkt. 99-8.)  The letter and its attachments do not refer to the amended complaint.  (*See id.*)  The letter offers to consider Cincinnati's concerns or objections to the proposed consent judgment provided that Cincinnati "is prepared to honor its contractual obligations."  Counsel requested that Cincinnati respond by January 29, 2016.  (*Id.*)  Cincinnati did not respond to the letter, and Berkshire and Charter Oak filed their Joint Motion for Entry of Consent Judgment on February 23, 2016.  (Dkt. 101, ¶ 14.)  At that point, the court entered consent judgment in favor of Charter Oak against Berkshire for the amount requested, finding in relevant part that: "BERKSHIRE accepted possession of the subject Equipment in exchange for the required payments…"; "GOLD made all of its required payments to BERKSHIRE for the

---

[4] Shortly after this on September 29, 2015, Charter Oak moved to become an Intervenor Defendant in the instant case (Dkt. 45), which resolved as moot on April 7, 2016 (Dkt. 72) after the consent judgment had been entered.

bailment"; and "BERKSHIRE owed certain duties to GOLD, including the duty to safely store its Equipment in a reasonable manner at a secure location…" (Dkt. 99-3, ¶¶ 11-13.)

Cincinnati and Berkshire now move for summary judgment pursuant to their cross-motions filed on December 14, 2016. (Dkt. 94; Dkt. 97.)

## STANDARD OF REVIEW

Courts grant summary judgment where the movant shows that no genuine dispute of material fact remains and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks and citation omitted). Courts appropriately grant summary judgment where "no reasonable jury could rule in favor of the nonmoving party." *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted). On cross-motions for summary judgment, each movant must satisfy the requirements. *See Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Therefore, when considering Cincinnati's Motion, the Court views all evidence in the light most favorable to Berkshire, and when considering Berkshire's Motion, the Court views all evidence in the light most favorable to Cincinnati. *See e.g., Hinsdale v. Village of Westchester, Illinois*, No. 15 C 4926, 2017 WL 991489, at *3 (N.D.Ill. Mar. 15, 2017) (citing *Int'l Bhd. Of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002)). Nonmoving parties must still put forth enough evidence to support reasonable inferences, as courts "draw only the reasonable inferences" and "are not required to draw every conceivable inference from the record." *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (internal quotations and citations omitted); *see e.g., Cordon v. Centex Homes*, 835 F.Supp.2d 543, 548 (N.D.Ill. 2011).

**<u>DISCUSSION</u>**

In sum, Cincinnati argues that it had no duty to defend the Berkshire Defendants in the underlying case because coverage has not been triggered and various exclusions apply. Berkshire argues that the underlying complaints in fact triggered coverage under the Property, CGL, and Umbrella Coverage Parts of its Policy from Cincinnati. Berkshire also contends that the exclusions do not permit Cincinnati to avoid its duty to defend, and further that Cincinnati has a duty to indemnify the damages from the consent judgment.[5]

## I.    Duty to Defend

The parties agree that Illinois law controls the construction and application of the Policy's terms. To determine whether an insurer has a duty to defend, the Court must compare the allegations of the underlying complaints to the relevant portions of the Policy. *See Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 108, 180 Ill.Dec. 691, 607 N.E.2d (Ill. 1992); *see e.g.*, *OneBeacon America Insurance Co. v. City of Zion*, 119 F.Supp.3d 821, 832 (N.D.Ill. 2015). Policy provisions that limit or exclude coverage are to be construed liberally in favor of the insured. *Liberty Mutual Ins. Co. v. Zurich Ins. Co.*, 402 Ill.App.3d 37, 39, 341 Ill.Dec. 363, 930 N.E.2d 573 (1st Dist. 2010) (citing *American States Insurance Co. v. Koloms*, 177 Ill.2d 473, 479, 227 Ill.Dec. 149, 687 N.E.2d 72 (1997)). Courts read the policy as a whole and interpret any ambiguities in favor of the insured. *Id.* (internal citations omitted). "An insurer may not justifiably refuse to defend an action against its insured unless it is clear from the face of the *underlying complaints* that the allegations fail to state facts which bring the case within, the policy's coverage." *See e.g.*, *General Ins. Co. of America v. Clark Mall Corp.*, No.

---

[5] Cincinnati contends that Berkshire lacks standing to file its Motion for Summary Judgment because the underlying action resolved and transferred interest to Charter Oak such that Berkshire no longer has an "injury in fact" in this case. (Dkt. 100, at 1.) However, under Rule 25 an action can continue against the original party and the judgment will bind its successor in interest. *See* Fed. R. Civ. P. 25(c); *see e.g.*, *Valerio v. Total Taxi Repair & Body Shop, LLC*, No. 12 C 9985, 2015 WL 3962573, at *2 (N.D.Ill. June 25, 2015) (internal citations omitted).

08 C 2787, 2010 WL 2901788, at *3 (July 26, 2010) (citing *U.S. Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 73, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991)) (emphasis added in part and omitted in part). Further, "if the underlying complaints allege several theories of recovery against the insured, the duty to defend arises even if only one such theory is within the potential coverage of the policy." *Id.* The factual allegations, rather than the legal theories, trigger a duty to defend. *Id.* (citing *Management Support Assoc. v. Union Indem. Insurance Co. of New York*, 129 Ill.App.3d 1089, 1097, 85 Ill.Dec. 37, 473 N.E.2d 405 (1st Dist. 1984). On the other hand, if it is clear from the face of the underlying complaint that the allegations fail to state facts that bring the case within the policy's coverage, then the insurer has no duty to defend. *See Connecticut Indemnity Co. v. DER Travel, Inc.*, 328 F.3d 347, 349 (7th Cir. 2003).

Generally, courts may only refer to the allegations of the complaint to determine a duty to defend. *Pekin Ins. Co. v. Wilson*, 237 Ill.2d 446, 456, 341 Ill.Dec. 497, 930 N.E.2d 1011 (Ill. 2010) (citing *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987)). Courts analyzing whether the insurer has a duty to defend must center their analysis on the underlying action "because the insurer must determine whether it has an obligation to defend at the outset of the litigation." *See e.g.*, *OneBeacon*, 119 F.Supp.3d at 832-33 (citing *Travelers Ins. Companies v. Penda Corp.*, 974 F.2d 823, 927 (7th Cir. 1992).

However, Illinois is one of the jurisdictions that allows a court to look beyond the allegations in the underlying complaint so long as the court does not determine an issue critical to the underlying action. *See Pekin*, 237 Ill.2d at 456; *see e.g.*, *General Ins. Co. of America*, 2010 WL 2901788, at *4. Specifically, courts may not determine a critical issue while the underlying matter is still pending. *See Pekin*, 237 Ill.2d at 461 (citing *Fidelity & Casualty Co. of New York v. Envirodyne Engineers, Inc.*, 122 Ill.App.3d 301, 304-05, 77 Ill.Dec. 848, 461

N.E.2d 471 (1983), relying on "leading Illinois Supreme Court case in this area" *Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 355 N.E. 2d, which held that the trial's court's reliance on extrinsic evidence was premature because it had determined one of the ultimate facts "prior to the completion of the underlying tort action").[6]  In summary judgment proceedings to determine the duty of defend, courts may consider not only the underlying and instant pleadings, but other evidence as well.  *Id.* (citing *Envirodyne Engineers, Inc.* and *American Economy Insurance Co. v. Holabird & Root*, 382 Ill.App.3d 1017, 1022-32, 320 Ill.Dec. 97, 886 N.E.2d 1166 (1st Dist. 2008)).  "To require the trial court to look solely to the complaint in the underlying action to determine coverage would make the declaratory proceeding little more than a useless exercise possessing no attendant benefit and would greatly diminish a declaratory action's purpose of settling and fixing the rights of the parties."  *Id.* (citing *Envirodyne Engineers, Inc.*, 122 Ill.App.3d at 304-05).  Moreover, courts need not look to each count or complaint in isolation, but can consider "all the facts alleged in both complaints in a single analysis of the duty to defend question" and perform a textual analysis of the complaints to decide if the allegations triggered the insurance company's duty to defend.  *See SCR Medical Transportation Services Inc. v. Browne*, 335 Ill.App.3d 585, 589-90, 269 Ill.Dec. 767, 781 N.E.2d 564 (1st Dist. 2002) (citing *Lexmark International, Inc. v. Transportation Insurance Co.*, 327 Ill.App.3d 128, 136-37, 260 Ill.Dec. 658, 761 N.E.2d 1214 (2001)).

---

[6] Throughout its pleadings, Berkshire frequently cites to *Atlantic Mutual Ins. v. American Academy of Orthopaedic Surgeons* [sic] for the proposition that "the use of extrinsic evidence is inappropriate" in a summary judgment seeking declaratory judgment regarding the insurer's duty to defend. 315 Ill.App.3d 552, 567, 248 Ill.Dec. 342, 734 N.E.2d 50 (1st Dist. 2000).  However, *Atlantic Mutual* relies on *Bituminous Casualty Corp. v. Fulkerson* for this principle.  *See id.* (citing 212 Ill.App.3d 556, 562, 156 Ill.Dec. 669, 571 N.E.2d 256 (5th Dist. 1991)).  *Bituminous Casualty* in turn relies on *Zurich Insurance Co. v. Raymark Industries*, 118 Ill.2d 23, 52, 112 Ill.Dec. 684, 514 N.E.2d 150 (Ill. 1987), which the Illinois Supreme Court has since clarified in *Pekin* with the interpretation and law provided here.

### a. Property Coverage

There is no dispute between the parties about the Policy itself, so the Court focuses its attention on the underlying allegations together with the Policy to determine whether Cincinnati had a duty to defend.

The Policy's Property provision includes coverage for the personal property of others that is within the "care, custody or control" of Berkshire, but said property must be "on or within 1,000 feet" of what the Policy deems "covered locations." (Dkt. 96-9, at 40, 43.) Berkshire's Policy with Cincinnati included the 4550 S. Packers Avenue premises, but not the 1250 W. 42nd Street premises. (*Id.* at 8.) Berkshire does not argue that Cincinnati had a duty to defend based on the original complaint filed on July 9, 2014 in the underlying matter, which stated that Gold's equipment had gone missing from 42nd Street location. (*See* Dkt. 99-4, ¶¶ 15-16, 21.) Rather, Berkshire argues that Charter Oak and Gold's Amended Complaint filed on May 26, 2015 in the underlying action triggered Cincinnati's obligation because the Amended Complaint removed reference to the 42nd Street premises, thus reinstating the potential for the incident to fall within the Policy because the face of the complaint no longer made it clear that the property had gone missing from a location not on or within 1,000 feet of the Packers Avenue premises. (*See* Dkt. 99-5, ¶¶ 15-20; Dkt. 102, at 12-13.) Berkshire urges the Court to look solely at facts alleged in the underlying matter's Amended Complaint because it became the operative complaint, but Illinois courts have made clear that the Court may look beyond the confines of that document to others, including the original complaint. *See Pekin*, 237 Ill.2d at 456, 461; *SCR Medical Transportation Services Inc.*, 335 Ill.App.3d at 589-90; *see e.g.*, *General Ins. Co. of America*, 2010 WL 2901788, at *4. Based on this construction, it is reasonable that Cincinnati declined to defend Berkshire under the Property Coverage. From the original complaint, Cincinnati had

notice that Berkshire had removed the trailers containing Gold's baking equipment to the 42nd Street premises. In its investigation, Cincinnati employed a surveyor who measured and certified that, no matter the angle, the 42nd Street location did not fall within 1,000 feet of a location listed on the Policy's Endorsements because it was at least 1,774.06 feet away from the Packers Avenue premises that was listed.[7] (*See* Dkt. 99-6, at 4-5; Dkt. 96-5; Dkt. 96-6.) When Charter Oak filed its Amended Complaint almost a year later in May 2015 and simply removed reference to the 42nd Street premises, this did not change the fact that Cincinnati had already conducted its investigation based on the facts alleged in the original complaint and determined that the property loss had occurred at a location excepted from the Policy. Taking the two complaints together, it is not even arguable that the facts alleged by Charter Oak could have fallen with the Policy's Property Coverage, so Cincinnati had no duty to defend on this basis. *See Connecticut Indemnity Co.*, 328 F.3d at 349.

### b. The Care, Custody or Control Exclusion as Applied to the Policy's CGL and Umbrella Coverage

The Policy's CGL Coverage provides that Cincinnati would back Berkshire in a suit for damages, including property damage. (Dkt. 96-9, at 108.) Yet this provision disclaims a right or duty to defend suit if the Policy would not apply, and then states that the Policy would not apply where the insured had "care, custody or control" of the property. (*Id.* at 108, 112.) Similarly, the Policy's Umbrella Coverage provides that Cincinnati would cover Berkshire's net loss if Berkshire must pay damages beyond the costs that another insurance company involved in the matter would pay, but also excludes property not owned by Berkshire but rather in its care, custody or control. (*Id.* at 250, 254, 283.)

---

[7] The record also does not show, nor do the Parties argue, that the 42nd Street premises fell on or within 1,000 feet of the other location listed on the Policy's Schedule of Locations at 1211 S. Prairie Avenue. (Dkt. 96-9, at 8.)

In Illinois, the insured is said to have care, custody or control of another's property where the insured possessed the property at the time of the loss and the property was a "necessary" element of the work. *Bolanowski v. McKinney*, 220 Ill.App.3d 910, 914, 163 Ill.Dec. 394, 581 N.E.2d 345 (1st Dist. 1991) (internal citations omitted).

### 1. Possession

To have possession, the insured must have exclusive control, but that control need not be continuous and it must only exist at the time the property was lost or damaged. *Id.* Courts have found that the insured did not possess the property for these purposes where the underlying complaints did not allege that the insured was granted the right to access equipment in order to move or protect it. *Id.* at 915 (finding that musicians simply leaving their instruments at the lounge where they performed did not mean that the lounge "possessed" the equipment). However, insured parties have been found to possess equipment when they kept the property in their vehicle, where the insured secured the equipment in a warehouse, or simply where the insured agreed to provide storage for the equipment. *See Nationwide Insurance Co. v. Central Laborers' Pension Fund*, 704 F.3d 522, 526 (7th Cir. 2013) (affirming summary judgment for insurer in part because possessory control became exclusive when employee moved confidential information on compact disc to her personal vehicle); *Stewart Warner Corp. v. Burns International Security Services, Inc.*, 527 F.2d 1025, 1029-30 (7th Cir. 1975) (affirming summary judgment for insurer under the care, custody, control exclusion where insured provided warehouse security even if the watchman did not "intimate[ly] handl[e]" the property items stored in the warehouse); *Essex Insurance Co. v. Wright*, 371 Ill.App.3d 437, 441-42, 308 Ill.Dec. 991, 862 N.E.2d 1194 (1st Dist. 2007) (finding that the insured automobile recycling business exercised possession by storing a truck and thus ought to have kept the truck safe and

returned it to its owner). Courts have found property in the insured's possession even if their owners could still access the property. *See Country Mutual Insurance Co. v. Waldman Mercantile Co., Inc.*, 103 Ill.App.3d 39, 41-42, 58 Ill.Dec. 574, 430 N.E.2d 606 (5th Dist. 1981) (where lessees weekly maintained the merchandise considered possessed by the reseller).

Here, in both the original and amended complaints in the underlying matters Charter Oak alleged that before the date of the loss Berkshire agreed to store Gold's equipment in trailers provided by Berkshire in exchange for a monthly fee. (Dkt. 99-4, ¶ 14; Dkt. 99-5, ¶ 14.) Further, both complaints allege that the equipment went missing while it was kept in these trailers provided by Berkshire, while the original complaint adds that Berkshire moved these trailers to another location unbeknownst to Gold. (Dkt. 99-4, ¶¶ 15-16; Dkt. 99-5, ¶¶ 15-17.) Based upon these allegations, Cincinnati had reason to believe that Berkshire possessed the property because the complaints alleged that Berkshire agreed to store the equipment and thus under the law agreed to keep it safe from damage or loss and would be said to possess it. Likewise, neither notes that Berkshire stored the trailers on the property of another company, nor that Gold had any access to the trailers, so similarly Cincinnati would not have reason to believe under the law that Berkshire would not be said to possess this equipment. *See Nationwide Insurance Co.*, 704 F.3d at 526; *Stewart Warner Corp.*, 527 F.2d at 1029-30; *Essex Insurance Co.*, 371 Ill.App.3d at 441-42; *Waldman Mercantile Co., Inc.*, 103 Ill.App.3d at 41-42.

## 2. Necessary

To be in the care, custody, or control of the insured, the property must also serve as a necessary element of the insured's work. *Bolanowski*, 220 Ill.App.3d at 914. Courts have found necessary the secure handling of confidential information by an accountant a vehicle stored by a company that recycles vehicles, and consigned merchandise leased to a consignment business.

*See e.g.*, *Nationwide Insurance Co.*, 704 F.3d at 527 (the "handling and care of confidential information is vital…rather than incidental [to] her ordinary employment activities"); *Essex Insurance Co.*, 371 Ill.App.3d at 442 (insured recycles vehicles so "[w]ithout automobiles to recycle" the insured could not carry out daily operations); *Waldman Mercantile Co., Inc.*, 103 Ill.App.3d at 43 (where goods for sale were necessary when insured ran "essentially a sales service").

Berkshire insists that Cincinnati could never establish on the face of the underlying complaints that Berkshire needed Gold's baking equipment in the course of its business because Berkshire is in the business of storing frozen or perishable food products in refrigerated warehousing and would never need baking equipment. (Dkt. 102, at 9.) Yet the underlying complaints allege that Berkshire "engaged in the business of warehousing and refrigerated storage." (Dkt. 99-4, ¶ 12; Dkt. 99-5, ¶ 12.) Berkshire admits these allegations in their answers to the underlying complaints. *See Charter Oak Fire Insurance Company a/s/o Gold Standard Baking, Inc. v. Berkshire Refrigerated Warehousing, LLC*, No. 14 C 5201, Answer to Complaint, Docket 14 (N.D.Ill. Apr. 2, 2015); Answer to Amended Complaint, Docket 25 (N.D.Ill. June 16, 2015). Indeed, not all of Berkshire's business consisted of refrigerated storage. Berkshire deals in the business of warehousing more generally. Therefore, whether a customer asked Berkshire to store frozen croissants, the equipment used to bake apple strudel, or office supplies that have nothing to do with pastries, the items are still necessary to Berkshire's work because as a company that provides warehousing Berkshire is in the business of storing its customers' merchandise. Like the accountant in *Nationwide*, handling customers' merchandise comprises a vital, not incidental, element of Berkshire's work. *See Nationwide Insurance Co.*, 704 F.3d at 527. And like the automobile recycler in *Essex* Berkshire would not have any functions to

provide without handling such items from others.  *See e.g.*, *Essex Insurance Co.*, 371 Ill.App.3d at 442.  Moreover, like the retailer in *Waldman*, Berkshire would not have a business but for handling its customers' merchandise.  *See e.g.*, *Waldman Mercantile Co., Inc.*, 103 Ill.App.3d at 43.  On the face of the complaints, Gold allegedly entered into an agreement with Berkshire "for the storage of equipment owned by Gold," in line with Berkshire's warehousing activities.  (Dkt. 99-4, ¶ 12; Dkt. 99-5, ¶ 12.)  Because of this, even just based on the factual allegations in the underlying complaints, Cincinnati would not have reason to believe that the equipment fell outside the scope of Berkshire's wheelhouse.

Taken together, the underlying complaints provide that as a warehouse business storing Gold's equipment Berkshire possessed this property as a necessary component of its day-to-day operations.  Because of this, under the law, Berkshire would be said to have held the equipment in its care, custody or control.  *See Nationwide Insurance Co.*, 704 F.3d at 526-27; *Stewart Warner Corp.*, 527 F.2d at 1029-30; *see e.g.*, *Essex Insurance Co.*, 371 Ill.App.3d at 441-42; *Waldman Mercantile Co., Inc.*, 103 Ill.App.3d at 41-43.[8]  Therefore, given the Policy's exclusions for property under the care, custody or control of Berkshire for both its CGL and Umbrella Coverage, under the law Cincinnati would not be liable for coverage based on the facts alleged by Charter Oak in the underlying matter.  Accordingly, Cincinnati also did not have a duty to defend Berkshire in the suit under either of these provisions.

---

[8] At the time of the underlying complaints, Cincinnati would not have had the benefit of the consent judgment later entered in the underlying matter, but the court there found that Gold made all required payments to Berkshire for "the bailment," and that as such Berkshire owed certain duties to Gold, including the duties to safely store Gold's equipment in a reasonable manner at a secure location; to return the equipment undamaged upon Gold's request. (Dkt. 99-3.)  The Court does not rely on these findings in its duty to defend analysis but for the purposes of summary judgment notes these findings as further evidence of the reasonableness of Cincinnati to determine that the underlying complaints alleged care, custody or control.

## II.    Duty to Indemnify

The duty to indemnify is much narrower than the duty to defend and arises only if the facts alleged actually fall within coverage. *See Westfield Insurance Co. v. Nat'l Decorating Service, Inc.*, 863 F.3d 690, 695 (7th Cir. 2017); *see e.g.*, *U.S. Fidelity and Guaranty Co. v. Shorenstein Realty Services, L.P.*, 700 F.Supp.2d 1003, 1015-16 (N.D.Ill. 2010) (citing *Guillen ex rel. Guillen v. Potomac Ins. Co. of Ill.*, 323 Ill.App.3d 121, 256 Ill.Dec. 51, 751 N.E.2d 104, 114 (1st Dist. 2001). The facts on record show that Berkshire moved the property at issue to the 42nd Street location and that this was more than 1,000 feet away from the Packers Avenue location listed on the Policy. Berkshire does not deny the truth of these facts at this stage of the litigation, and the surveyor certified the measurements as such. (*See* Dkt. 96-5; Dkt. 96-6; Dkt. 96-9, at 8, 35, 40, 43; Dkt. 103, ¶ 11.) The Policy's Property Coverage therefore excluded coverage for Berkshire for this matter.

As for the CGL and Umbrella Coverage, the record does not show that Cincinnati must indemnify Berkshire under the Policy. The Court need only look as far as the consent judgment to make this determination. Consent judgments do not always collaterally estop subsequent suits because the issues underlying the judgment generally are neither actually litigated nor essential to the judgment, but an exception exists where the judgment incorporates necessary factual findings into its order. *People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 178 n.5 (7th Cir. 1995); *see e.g.*, *In re Kmart Corp.*, 362 B.R. 361, 383 (N.D.Ill. 2007).[9] In order to conclude that Berkshire breached a duty to Gold, the consent judgment incorporated as fact that Gold paid Berkshire in a "bailment relationship" and then states that Berkshire owed duties to Gold to

---

[9] To be precluded, the issue must also meet the either criteria for issue preclusion: that the issue is the same as that involved in the prior action and that the party against whom estoppel has been invoked must have been party to or fully represented in the prior action. *See e.g.*, *In re Kmart Corp.*, 362 B.R. 361 at 383 (citing *People Who Care*, 68 F.3d at 178) (internal citations omitted).

safely store Gold's equipment in a reasonable manner at a secure location and to return the equipment undamaged upon Gold's request. (Dkt. 99-3.) Based on this construction, the judgment incorporates Berkshire and Gold's bailment relationship as the grounds for the duties owed and breached by Berkshire. Under Illinois law, a bailor-bailee relationship necessarily constitutes custody and control. *See Stewart*, 527 F.2d at 1029 (citing *Maryland Casualty Co.*, 10 Ill.App.2d at 1). Together, the consent judgment establishes that Berkshire had custody and control of Gold's baking equipment. Since this is the same question at issue in this analysis, and Berkshire was party to the underlying matter, the Court need look no further than this judgment to determine that Berkshire's claim fell into the care, custody or control exclusion of the Policy.

Even without relying on the consent judgment, the Court would reach the same conclusion under Illinois's care, custody and control analysis. First, Berkshire was storing Gold's equipment at the time of the loss and thus had control over it. (Dkt. 99-14, 16:2-15, 17:12:20; 22:10-23:18; 29:1-5; Dkt. 103, ¶ 16.) *See Nationwide Insurance Co.*, 704 F.3d at 526; *Stewart Warner Corp.*, 527 F.2d at 1029-30; *Essex Insurance Co.*, 371 Ill.App.3d at 441-42. Even though the trailers sat on Fresh Start's premises, Berkshire need not have had exclusive access to the equipment to control it, but rather the authority to move it, which Gold had granted to Berkshire. (Dkt. 99-14, 22:10-23:18.) Similarly, even if Gold held the keys to the locks on the trailers, Oberlander still needed to call upon Grzywacz in order to access the equipment at the 42nd Street premises, evidencing Berkshire's ultimate control over the equipment while it remained in storage with Berkshire. (*Id.* at 27:6-28:5.) *See Waldman Mercantile Co., Inc.*, 103 Ill.App.3d at 41-42 (where lessees still regularly accessed the merchandise possessed by the reseller at the time of the loss). Second, as a business that provides warehousing services to its customers, which Berkshire admits, Berkshire's storing equipment for its second largest

customer constitutes a necessary part of its business regardless of the temperature at which it stores the property because without offering to store materials for its customers, Berkshire would be out of business. (Dkt. 99-14, 14:4-13; *Charter Oak*, No. 14 C 5201, Dkts. 14 and 25.) *See e.g.*, *Nationwide Insurance Co.*, 704 F.3d at 527; *Essex Insurance Co.*, 371 Ill.App.3d at 442; *Waldman Mercantile Co., Inc.*, 103 Ill.App.3d at 43. Gryzwacz agreed to hold onto Gold's baking equipment as a favor, but he admits that he did so "as an accommodation for [Berkshire's] second largest customer." (Dkt. 99-14, 14:4-13; 19:24-20:3.) This was not a favor in the sense of a goodwill gesture granted without the expectation of something in return. Berkshire made this arrangement with the expectation of maintaining or building a relationship with a major customer from whom Berkshire could anticipate future business. In other words, this was a business decision. Berkshire agreed to hold onto the equipment with the expectation that doing so could lead to future revenue. What's more, the favor did not consist of perks or gifts incidental to Berkshire's line of business, like tickets to a sporting event or a box of candies at the holidays. The favor literally consisted of the type of service that Berkshire provides day in and day out for its regular customers, including Gold, but at cost. Berkshire and Gold made a deal. It is therefore a central and necessary component of Berkshire's work activities.

For these reasons, the record belies Berkshire's claims and Cincinnati does not have a duty to indemnify Berkshire for this incident under the Policy.

## **CONCLUSION**

For these reasons, the Court grants Cincinnati's Motion for Summary Judgment against

Berkshire [94] and denies Berkshire's Motion for Summary Judgment against Cincinnati [97].


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois


Date: August 24, 2017